IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FANTA SILLAH,

    Plaintiff,

v.

THOMAS E. PRICE, *et al.*,

    Defendants.

Civil Action No. PX-16-1441

******

## MEMORANDUM OPINION

Pending in this employment discrimination case are two Motions for Summary Judgment filed by Defendants Leidos Biomedical Research, Inc. ("Leidos"), ECF No. 83, and then-Acting Secretary of Health and Human Services Eric Hargan, ECF No. 86.[1] The issues have been fully briefed, and no hearing is necessary. *See* D. Md. Loc. R. 105.6. For the reasons stated below, Defendants' Motions are GRANTED.

**I.    BACKGROUND**

In February 2012, Plaintiff Fanta Sillah began working for Leidos (then SAIC-Frederick) as a Patient Care Coordinator II, and was assigned to work at the National Institute of Arthritis and Musculoskeletal and Skin Diseases ("NIAMS") at the National Institutes of Health ("NIH"). *See* ECF No. 83-3 at 79–80 (Sillah Dep. Ex. 2); ECF No. 86-3 at 9, 10 (Sillah Dep. 35:1–4, 37:2–20). The NIH had engaged Leidos to provide clinical support personnel for the institution. ECF No. 86-5 at 21 (Talar-Williams Dep. 77:16–79:5). Sillah worked at an NIH building and

---

[1] When this case was initiated, Sylvia Burwell was the Secretary of Health and Human Services. Thomas E. Price subsequently became Secretary of Health and Human Services, and his name is reflected on certain filings in this case. Hargan was Acting Secretary at the time these motions were filed. Hargan now is Deputy Secretary of Health and Human Services; Alex Azar assumed office as Secretary of Health and Human Services on January 29, 2018, approximately two months after these motions were filed. This does not affect the substance of the motions or the disposition of this case.

1

received training from the NIH. ECF No. 86-3 at 73 (Sillah Dep. 292:3–16). Leidos paid Sillah's salary and determined her sick leave. ECF 86-3 at 74 (Sillah Dep. 294:13–20).

Sillah worked for the Lupus Clinical Research Program in NIAMS, led by Dr. Sarfaraz Hasni. ECF No. 89-13 ¶ 3; ECF No. 86-4 at 6 (Hasni Dep. 18:22–19:8). Sillah scheduled patients and acted as a liaison between physicians, nursing staff, and other departments. ECF No. 86-7. Sillah's duties also included picking up blood specimens ("blood pickups" or "blood runs"), calling patients, and giving occasional support to clinical trials. ECF No. 86-3 at 11 (Sillah Dep. 42:11–44:9). Defendants contend that Sillah's job performance had become increasingly poor leading up to her termination. *See* ECF No. 86-5 at 13 (Talar-Williams Dep. 45:12–47:8). Sillah received a rating of 3 out of 5 in her 2013 and 2014 performance reviews, and 2 out of 5 in 2015. ECF No. 86-3 at 12, 13, 14 (Sillah Dep. 47:10–16, 49:5–15, 56:4–18).

In mid-2014, Sillah became pregnant. ECF 86-3 at 16 (Sillah Dep. 64:16–19). In November 2014, Sillah experienced complications arising from her pregnancy which resulted in her hospitalization. *See* ECF 86-3 at 17 (Sillah Dep. 66:17–22). Initially, Sillah told her Leidos supervisor, Taree Foltz, that she had been hospitalized for a stomach virus, but later told Foltz the truth when more extensive hospitalization was needed. ECF No. 86-6 at 16 (Foltz Dep. 59:6–16, 60:2–12). On December 2, 2014, Sillah suffered a miscarriage. ECF No. 86-3 at 19 (Sillah Dep. 75:4–6). She received short-term disability insurance and took time off pursuant to the Family and Medical Leave Act from November 18, 2014, through January 12, 2015. ECF No. 86-3 at 18–19 (Sillah Dep. 72:16–74:10). Sillah returned to work on January 13, 2015. ECF No. 86-3 at 19 (Sillah Dep.75:8–10).

In March 2015, Dr. Hasni expressed concerns about Sillah's work performance. ECF No. 89-13 ¶¶ 4–6. Although Sillah's performance review in 2014 was generally positive,

according to Dr. Hasni, Sillah's performance was unsatisfactory and inconsistent in 2014 (before she became pregnant), as well as after she returned from leave in January 2015. *See* ECF No. 86-4 at 21 (Hasni Dep. 79:2–80:11). Like Dr. Hasni, Foltz testified that Sillah's performance was lacking both before and after her first pregnancy and that Sillah's work performance suffered from her unsatisfactory communication skills. ECF No. 86-6 at 17 (Foltz Dep. 62:22–64:4); *see also* ECF No. 92-35 at 2 (noting issues with Sillah in October 2014). On March 10, 2015, Dr. Hasni emailed NIAMS clinical operations manager Cheryl Talar-Williams to say that he had met with Sillah's coworkers regarding their complaints about Sillah's poor work performance. *See generally* ECF No. 89-14. Dr. Hasni also told Talar-Williams that "we need a more reliable person as a patient care coordinator. Can we please discuss her performance and work on getting a better alternative." ECF No. 89-14 at 3. On March 11, 2015, Talar-Williams said she would touch base with Foltz. ECF No. 89-14 at 2.

On March 12, 2015, Foltz met with Sillah to discuss performance concerns, noting Sillah's problems with completing tasks, responding to requests, and communication. ECF No. 89-15 at 2–3. Foltz warned Sillah that she may be placed on a performance improvement plan ("PIP") in the future. ECF No. 89-15 at 3.

In April 2015, Foltz emailed Dr. Hasni and other members of Sillah's NIAMS team for feedback in advance of Sillah's annual performance evaluation. ECF No. 89-16 at 2. Dr. Hasni wrote, "I have noticed improvement in her work. But I think she still need[s] to work on closing the loop of her assigned work at the end of the day. However, a significant improvement overall." ECF No. 89-16 at 2.

On April 20, 2015, Sillah received a rating of 2 out of 5 for her 2015 performance evaluation. ECF No. 86-9 at 2. That rating is described as "generally meets expectations." ECF

No. 86-9 at 1. The review stated that Sillah's work was "somewhat inconsistent" and that Sillah required "step-by-step instructions on how to complete various tasks." ECF No. 86-9 at 1. In the review, it was "strongly suggested that [Sillah] utilize existing out-of-office notifications, both via email and phone, so that staff and patients are made aware of her availability." ECF No. 86-9 at 1. Although initially Foltz had planned to put Sillah on a PIP at that time, Foltz decided to withhold the PIP and instead monitor Sillah less formally. ECF No. 89-18 at 2.

After the April evaluation, in late April or early May, Sillah learned that she was pregnant again. ECF No. 86-3 at 20 (Sillah Dep. 77:9–11). Although Sillah did not announce her pregnancy at that time, Sillah testified that she began showing physical signs of pregnancy in late May or early June. ECF No. 86-3 at 21 (Sillah Dep. 81:1–15). Sillah states that she suffered from morning sickness while at work, but admits that she did not tell her co-workers, nor did anyone ask. ECF No. 86-3 at 21 (Sillah Dep. 82:11–22). No other record evidence demonstrates that anyone knew about Sillah's second pregnancy at that time.

On June 1, 2015, Foltz met with Sillah to discuss persistent work deficiencies, including Sillah's failure to complete tasks, notify her supervisor and team of absences, or set up out-of-office notifications. ECF No. 89-18 at 2–3; *see* ECF No. 86-3 at 26 (Sillah Dep. 103:10–104:18). On June 15, 2015, Sillah emailed Dr. Hasni and Foltz that she was out sick. ECF No. 89-44 at 5. Foltz replied to Sillah's email asking whether she set an out-of-office notification. ECF No. 89-44 at 4. On June 16, 2015, Sillah followed up with Foltz, explaining that she had not set a notification because she had been hospitalized due to a stomach virus. ECF No. 89-44 at 3–4.

On June 17, 2015, Foltz reached out to Dr. Hasni for feedback on Sillah's performance, noting that Dr. Hasni and Talar-Williams had expressed disappointment that Sillah had not been

placed on a PIP. ECF No. 89-21 at 2–3. Dr. Hasni confirmed that he was surprised Sillah was not already on a PIP, and that "[h]er performance is unpredictable at times[.] [S]he will do things right and other times she will not." ECF No. 89-21 at 2. Indeed, both Dr. Hasni and Talar-Williams believed that Sillah had been put on a PIP by Foltz around April, and only later learned that Foltz had delayed its implementation. ECF No. 86-5 at 17 (Talar-Williams Dep. 62:18–64:21).

On June 24, 2015, Foltz placed Sillah on a sixty-day PIP, which required that Sillah improve her "reliability, communication skills, organization, and attention to detail." ECF No. 89-22 at 2. If Sillah "fail[ed] to demonstrate immediate and sustained improvement" in identified performance areas, Sillah "may be released from employment at the end of the 60 days." ECF No. 89-22 at 4. As part of the PIP, Sillah was required to complete weekly progress logs and meetings regarding her work. ECF No. 89-22 at 3; *see* ECF No. 89-23.

On June 26, 2015, Sillah met with Dr. Hasni and Mary Spinelli, who was filling in for Foltz. ECF No. 89-23 at 2; ECF No. 89-37 at 20 (Spinelli Dep. 70:18–21). Dr. Hasni discussed with Sillah the need for better communication skills, initiative to complete assignments in a timely fashion, and notification to her team of absences. ECF No. 89-23 at 2.

In early July 2015, Sillah required surgery related to her pregnancy and missed one week of work as a result. ECF No. 86-3 at 32 (Sillah Dep. 127:21–128:4). Sillah did not tell her supervisors that the surgery was pregnancy-related. ECF No. 86-3 at 52 (Sillah Dep. 205:5–20); ECF No. 86-4 at 32 (Hasni Dep. 122:1–14); ECF No. 86-6 at 19–30 (Foltz Dep. 111:21–113:21).

Sillah returned to work on July 15, 2015, on medical restriction. *See* ECF No. 86-3 at 33 (Sillah Dep. 129:3–5). That day, Sillah met with Foltz and Spinelli to discuss her work and feedback from her team. *See* ECF No. 92-11 at 2. Sillah was informed that, pursuant to the PIP,

5

she had to fill out her weekly logs with appropriate detail, and was also asked to improve communication with her team regarding the status of the tasks she had been assigned. ECF No. 92-11 at 2; *see* ECF 86-3 at 33 (Sillah Dep. 132:18–22). Sillah notified Foltz and Spinelli that she was pregnant,[2] and presented Foltz with a physician's note stating that Sillah could not perform heavy lifting or frequently use stairs. ECF No. 92-11 at 2–3; ECF 86-3 at 33 (Sillah Dep. 129:4–130:19). Foltz discussed with Sillah that she should use the elevators to complete blood pickups, which Sillah said she would attempt to do. ECF No. 92-11 at 3.

The request for more detailed logs was reiterated to Sillah on July 23, 2015. ECF No. 92-11 at 3. On July 24, Dr. Hasni reached out to members of Sillah's team for additional feedback, and was told that Sillah's work was "still suboptimal," including because she required "reminders to ensure assigned tasks are completed." ECF No. 92-36 at 2. On August 3, 2015, Foltz reached out to Sillah because she had failed to provide the logs for her previous two weeks of work. ECF No. 92-11 at 3. The logs also still lacked sufficient detail. ECF No. 92-11 at 3. Then, on August 5, 2015, during a meeting, Foltz and Spinelli shared with Sillah that her coworkers had been reporting continued performance deficiencies. ECF No. 89-26 at 3; ECF No. 89-33 ¶ 6. Foltz also told Sillah that her weekly logs still were not sufficiently detailed and required additional information going forward. ECF No. 92-11 at 4; ECF No. 89-33 ¶ 6; ECF No. 89-26 at 3. Sillah believed the complaints to be unfair and motivated by discriminatory animus. ECF No. 89-33 ¶¶ 7, 9. Sillah informed Foltz and Spinelli that she intended to file discrimination claims based on the feedback. ECF No. 89-33 ¶ 9.

Immediately after the August 5 meeting, Sillah met with Dr. Hasni and told him that she believed the criticism unwarranted. ECF No. 89-33 ¶ 10. Although Sillah did not inform Dr.

---

[2] Spinelli appears to have learned of the pregnancy earlier, but after the decision to place Sillah on the PIP was made. *See* ECF No. 92-4 at 17 (Spinelli Dep. 60:6–8).

6

Hasni that she intended to file an official complaint, Foltz informed Dr. Hasni of Sillah's intention. *See* ECF No. 89-26 at 2–3. Sillah asserts that within 24 hours of the August 5 meeting, she called Human Resources representative Mary Neville to discuss her complaints. ECF No. 86-3 at 37 (Sillah Dep. 147:16–19).

On August 5, after meeting with Sillah, Dr. Hasni sought more complete information from Sillah's team, including additional feedback about her work and "specific details about problem issues." ECF No. 89-26 at 2. In response, Dr. Hasni received several specific examples of Sillah's failure to complete basic tasks. *See generally* ECF No. 92-37. Additional feedback Dr. Hasni received indicated some improvement in Sillah's work, but noted that more improvement was needed with respect to her lack of focus and inability to be reached, as well as with her organization, prioritization of tasks, and problem-solving. ECF No. 89-25 at 2–3.

On August 10, 2015, Dr. Hasni, Talar-Williams, Spinelli, and Foltz met to discuss Sillah in light of the various feedback that had been received. *See* ECF No. 89-27 at 3. Dr. Hasni said that Sillah continued to be disorganized, unable to work independently, and lacked focus. ECF No. 92-11 at 4.[3] On August 11, Dr. Hasni emailed Talar-Williams, stating, "we need to move on [and] find a replacement for her." ECF No. 89-32 at 2. On August 12, Dr. Hasni, Talar-Williams, Spinelli, Foltz, and Sillah met again to talk about Sillah's job responsibilities. ECF No. 92-11 at 4. Foltz reiterated the need for Sillah to provide adequately detailed explanations of her work. ECF No. 92-11 at 5. Dr. Hasni shared specific examples of why he believed Sillah's performance was substandard, but eventually left the meeting because, in his view, the "conversations were going nowhere." ECF No. 92-11 at 5.

On August 18, 2015, Sillah formally announced her high-risk pregnancy to Talar-Williams and the rest of her NIAMS team. *See* ECF No. 89-31 at 3; ECF No. 86-3 at 20 (Sillah

---

[3]   Foltz's notes appear to misdate the meeting as having occurred on August 11, 2015.

Dep. 79:2–80:8); *see also* ECF No. 89 at 5.  Up to this point, Talar-Williams did not know that Sillah was pregnant.  ECF No. 86-5 at 27 (Talar-Williams Dep. 103:1–104:18).  After the meeting, Talar-Williams emailed other NIAMS staff members that Sillah had announced that she was pregnant, and therefore would need help with blood pickups.  ECF No. 89-31 at 3.  Dr. Hasni was not aware of Sillah's pregnancy until he received Talar-Williams' email that day.  ECF No. 86-4 at 17 (Hasni Dep. 65:12–66:7); *see* ECF No. 86-3 at 20 (Sillah Dep. 80:9–13).  Talar-Williams separately emailed Dr. Hasni that she believed the two of them were on the same page that they needed a new Patient Care Coordinator.  ECF No. 89-31 at 2.  Dr. Hasni agreed and stated that he had already started discussing possible replacements for Sillah, but said they should let Sillah's PIP run its course.  ECF No. 89-31 at 2.

On August 25, 2015, the PIP concluded.  Foltz told Sillah her performance was still deficient and Sillah was allowed to resign.  ECF No. 86-3 at 46–47 (Sillah Dep. 184:10–185:22).

After exhausting her administrative remedies, Sillah filed suit in this Court, asserting claims of sex/pregnancy discrimination, race discrimination, disability discrimination, and retaliation under Federal and Maryland law.  Defendants moved for dismissal, which the Court granted in part and denied in part.  *See* ECF Nos. 47, 48.  In keeping with the Court's Order, Sillah amended her Complaint.  *See* ECF No. 54.  The parties stipulated to dismissal of Sillah's race discrimination claims, Sillah's failure to accommodate claims, and Sillah's retaliation claims premised on requesting an accommodation.  *See* ECF No. 82 at 1.  Defendants now move for summary judgment as to the remaining pregnancy discrimination claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(k) ("Title VII") and Maryland law; disability discrimination claims in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et*

*seq.* ("ADA"), the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, and Maryland law; and retaliation claims for opposing pregnancy discrimination under Title VII and Maryland law.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In responding to a proper motion for summary judgment," the opposing party "must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub nom. Venugopal v. Shire Labs., Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23)). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Where a party's statement of a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court credits the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

The Court notes that the requirements of Sillah's Maryland and federal statutory claims are the same and so will be treated together. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio,*

*Inc.*, 53 F.3d 55, 57–58 (4th Cir. 1995); *Dyer v. Oracle Corp.*, Case No. PWG-16-521, 2016 WL 7048943, at *2 & n.5 (D. Md. Dec. 5, 2016); *Whittaker v. David's Beautiful People, Inc.*, Civil Action No. DKC 14-2483, 2016 WL 429963, at *2 n.2 (D. Md. Feb. 4, 2016); *Anderson v. Discovery Commc'ns, LLC*, 517 F. App'x 190, 193 n.3 (4th Cir. 2013), *as amended* (May 3, 2013); *Finkle v. Howard Cty.*, 640 F. App'x 245, 248 n.2 (4th Cir. 2016). The Court addresses Sillah's discrimination and retaliation claims in turn.

### A. Discriminatory Discharge

Sillah argues that she was terminated based on her high-risk pregnancy. The Court evaluates Sillah's claims using the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wells v. BAE Sys. Norfolk Ship Repair*, 483 F. Supp. 2d 497, 507–08 & n.8 (E.D. Va. 2007); *Ennis*, 53 F.3d at 57–58; *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000); *Riddick v. MAIC, Inc.*, 445 F. App'x 686, 687, 689 (4th Cir. 2011); *Cousin v. United States*, 230 F. Supp. 3d 475, 490–91 (E.D. Va. 2017). Sillah first must establish a *prima facie* case of discrimination by demonstrating that (1) she is a member of a protected group, (2) she was discharged, (3) she was fulfilling Defendants' legitimate expectations at the time of her discharge, and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination (or that the position was filled by a similarly qualified applicant outside the protected class). *See Wells*, 483 F. Supp. 2d at 507; *Ennis*, 53 F.3d at 58; *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

If Sillah establishes her *prima facie* case, the burden shifts to Defendants to offer a legitimate, non-discriminatory reason for her discharge. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216–17 (4th Cir. 2016). If Defendants provide such a reason, the burden then shifts back to Sillah to raise a genuine dispute as to whether Defendants' proffered reason is

mere pretext for discrimination. *See id.* Although the framework "involves a shifting back and forth of the evidentiary burden, Plaintiff, at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of" the law. *Venugopal*, 334 F. Supp. 2d at 841.

The Court assumes for the purposes of this analysis that Sillah has established a *prima facie* case. However, construing all evidence most favorably to Sillah, she nonetheless fails to rebut Defendants' professed legitimate, non-discriminatory reasons her discharge. Defendants particularly point to Sillah's longstanding substandard performance that resulted in poor evaluations and eventually a PIP. Defendants further point to record evidence that Sillah often fell short of the PIP requirements. Both before and during the PIP, Sillah had difficulty with communication, organization, following direction, and completing tasks. Thus, even viewing the evidence most favorably to Sillah, no reasonable jury could find that Defendants terminated Sillah because of her pregnancy rather than for legitimate reasons.

In response, Sillah contends that the record evidence shows that she "improved her performance dramatically" after her March 2015 meeting with Foltz, initially leading Foltz to withhold the PIP. As a result, says Sillah, placing her on a PIP was unwarranted and pretextual. Sillah, however, ignores that as of April 2015, Dr. Hasni and Talar-Williams both believed her performance so deficient that she had already been placed on a PIP, and were disappointed that she had not been. In light of this, and continued negative feedback regarding Sillah's work, Foltz's decision first to defer and then to implement the PIP does not generate a genuine dispute of material fact as to whether the PIP was pretextual.

Sillah next selectively cites to discrete portions of her April 2015 annual review, arguing that it reflects an acceptable work performance that met Defendants' expectations and

11

undermined the need for the PIP. *See* ECF No. 92 at 4. To the contrary, Sillah's evaluation shows that her performance was below what was expected. Sillah's overall rating was 2/5. ECF No. 92-17 at 3. This rating falls just above the categorical "does not meet expectations," and below "consistently meets expectations." ECF No. 92-17 at 2. Accordingly, based on this evaluation, Sillah was *not* consistently meeting expectations.

In fact, the evaluation plainly noted that Sillah lacked "organizational skills and attention to detail"; did not have adequate "focus on her requested daily to-do tasks"; sometimes required "numerous follow-ups"; and generally only was motivated to complete tasks in which she was interested. ECF No. 92-17 at 2. Sillah sometimes failed to attempt to complete tasks on her own, was not adequately informing her team members of upcoming absences, and was not using methods available to her to keep team members and patients aware of her availability. ECF No. 92-17 at 2. Although Sillah was "pleasant to work with and very personable," she had to "enhance daily communication" to provide efficient support to her team. ECF No. 92-17 at 3. Simply put, the April 2015 evaluation does not defeat summary judgment.

Sillah next argues that she was treated more harshly that her coworkers by being expected to notify coworkers of her absences or use out-of-office notifications, and thus that she was not subject to bona fide work requirements. *See* ECF No. 89 at 27; ECF No. 92 at 13–14. The record does not support such a contention. Rather, when Defendants learned that Sillah's coworkers had not provided out-of-office notifications, they, too, were corrected. *See* ECF No. 92-4 at 21 (Spinelli Dep. 74:17–75:16) (learned about others failing to use out-of-office notifications while Sillah was on the PIP, because Sillah informed them); ECF No. 92-11 at 2 (it was discovered that others were not consistently giving out-of-office notifications, but the issue was discussed and had been resolved); ECF No. 92-29 at 2 (Dr. Hasni stating he would speak to

12

others about using out-of-office voicemails but noting he almost never had to call those individuals because they share his office). Further, no record evidence demonstrates that expecting Sillah to use out-of-office notifications was somehow inappropriate. Given Sillah's other performance and communication shortcomings, the Court cannot infer that these requirements were put upon Sillah for illegitimate or manufactured reasons.

Sillah also argues that the temporal proximity between placing her on a PIP and her second pregnancy gives rise to the inference that the PIP was motivated by discriminatory animus, precluding summary judgment. As proof that Defendants knew of her pregnancy at the time the PIP was implemented, Sillah notes that she had told Foltz during her first pregnancy in 2014 that she had been hospitalized for a stomach virus when, in fact, she was pregnant. Thus, Sillah argues, Foltz must have known about Sillah's second pregnancy when Sillah again stated that she had a stomach virus in 2015. *See* ECF No. 92 at 2, 20. Sillah further contends that Foltz's knowledge of the second pregnancy is corroborated by Foltz's email to Sillah on June 16, 2015, which said, "Oh my gosh . . . hope everything is ok." *See* ECF No. 89-44 at 3. Sillah maintains that this email shows that Foltz thought something more serious than a stomach virus was at issue. ECF No. 92 at 2.[4] Accordingly, Sillah asserts, when Foltz emailed Dr. Hasni and Talar-Williams about placing Sillah on a PIP on June 17, 2015, she was motivated by Sillah's pregnancy.

This building up of inferences does not give rise to a genuine dispute of material fact sufficient to survive summary judgment. As Foltz's June 17, 2015, email makes plain, conversations about putting Sillah on a PIP had been initiated by Dr. Hasni and Talar-Williams before Foltz learned of Sillah's second "stomach virus." *See* ECF No. 89-21 at 2. Further, Foltz

---

[4] Foltz's response was sent after Sillah said she was in the hospital, but before Sillah said anything about a stomach virus. *See* ECF No. 89-44 at 3–4. After Sillah said she had a stomach virus but was "ok now," Foltz told Sillah that she was glad Sillah was starting to feel better. ECF No. 89-44 at 2–3.

did not even recall Sillah complaining of a stomach virus except during her first pregnancy. ECF No. 92-3 at 32 (Foltz Dep. 117:18–118:4). And even if Foltz had remembered the second "stomach virus" story, that Sillah twice told the same lie about a stomach bug does not plausibly support that Foltz knew that Sillah was *pregnant* in June 2015.

Nor does the record evidence support that any other supervisors knew that Sillah was pregnant at the time the PIP was implemented. Sillah argues that both Talar-Williams and Dr. Hasni must have been aware of her pregnancy some time between June 2015 and August 8, 2015, because Sillah had shown physical signs early in her *first* pregnancy; she had been asked by a colleague at some unspecified point in June 2015 if she was pregnant; she had told two NIH employees outside her chain of supervision that she was pregnant; the July doctor's note she provided prior to her surgery came from Greater Washington Maternal & Fetal Medicine & Genetics (even though it said nothing about pregnancy); and because as of August 8, 2015, she looked pregnant (as depicted in a photograph). *See* ECF No. 89 at 4–5; ECF No. 92 at 1–3. This evidence, when viewed most favorably to Sillah, cannot plausibly support that Dr. Hasni or Talar-Williams knew of her pregnancy before August 8, 2015, and certainly not at the time the PIP was initiated. *See* ECF No. 86-3 at 20, 21, 22 (Sillah Dep. 78:5–18, 79:2–13; 82:1–5, 85:9–12); ECF No. 92-8 at 4. The lion's share of this evidence does not demonstrate what anyone but Sillah knew (and chose to share with select colleagues) in June 2015. And while her physical appearance as of August 8 could allow a reasonable inference of knowledge, by that time, the PIP had been in effect for over a month and Sillah's performance continued to be deficient. Accordingly, no reasonable fact-finder could conclude that the PIP and consequent termination were motivated by discriminatory animus. Summary judgment in Defendants' favor is appropriate as to Sillah's discriminatory discharge claims.

### B. Retaliation

Sillah's retaliation claim is governed by the same burden-shifting framework as her discriminatory discharge claim. *See Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). As with a discrimination claim, if a plaintiff makes a showing sufficient to support a *prima facie* retaliation claim, the burden then shifts to the defendant "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* at 328 (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)). If the defendant makes this showing, the plaintiff must rebut the defendant's evidence and demonstrate that the purported reason is pretextual. *Id.* To make out a *prima facie* case of retaliation, Sillah must demonstrate that: (1) she engaged in protected activity, (2) Defendants took an adverse action against her, and (3) a causal link exists between the two. *Id.* at 327; *Rhoads v. FDIC*, 257 F.3d 373, 391–92 (4th Cir. 2001).

For purposes of this analysis, the Court assumes that Sillah engaged in a protected activity by informing her supervisors of her intent to complain about Defendants' discriminatory mistreatment on August 5, 2015.[5] It is also undisputed that Sillah's discharge constitutes an adverse action. As to the causal link between protected activity and Sillah's discharge, although the record is thin, the Court finds that the temporal proximity between Sillah informing her supervisors that she planned to formally complain and the termination of her employment is sufficient to make out a *prima facie* case. *See Strothers*, 895 F.3d at 335 (establishing a causal relationship at the *prima facie* stage is not an onerous burden); *id.* at 336–37 ("temporal proximity is sufficient to establish a causal connection at the *prima facie* stage").

---

[5] The Court need not reach whether Sillah's belief that she was discriminated against was reasonable, as required to make out a successful retaliation claim. *See Strothers*, 895 F.3d at 327.

Nevertheless, the retaliation claim fails because no record evidence, viewed most favorably to Sillah, sufficiently rebuts Defendants' legitimate, non-retaliatory reason for her discharge. Instead, the record reflects that Sillah's employment was terminated because of her longstanding and well-documented deficient work performance. It is undisputed that Sillah's performance problems arose well in advance of her April 20, 2015, review, on which she received only a 2/5 rating. Sillah was then placed on the PIP in June 2015, also before she complained about any discrimination. Sillah's performance issues persisted throughout the summer of 2015, with Sillah's supervisors and coworkers noting her work deficiencies in June, July, and August, prior to Sillah complaining on August 5, 2015.

By the very terms of the PIP, Sillah would be discharged at the conclusion of sixty days if she did not demonstrate immediate and sustained improvement in her performance. Sillah failed so to demonstrate and, as such, she was terminated on August 25, 2015. The temporal proximity between Sillah's protected activity and the PIP ending without sufficient improvement in her performance does not create a genuine dispute as to whether Sillah was terminated for legitimate reasons. Summary judgment is therefore granted as to Sillah's retaliation claim.

### C. Joint Employer Status

Because the Court concludes that Sillah's claims fail on the merits, the Court does not address the question whether Defendants were joint employers.

### IV. CONCLUSION

Although the Court does not doubt that Sillah believes she suffered discrimination, her belief, "no matter how heartfelt," cannot substitute for evidence supporting her causes of action. *Bowen v. Darby Dev. Co., Inc.*, Civil Action No. 2:10-2509-RMG-BM, 2012 WL 2675323, at *10 (D.S.C. Apr. 26, 2012), report and recommendation adopted, Civil Action No. 2:10-cv-2509-RMG, 2012 WL 2675470 (D.S.C. July 6, 2012). Based on the evidence before this Court,

no reasonable fact-finder could conclude that Defendants discharged Sillah because of a discriminatory or retaliatory motive. Defendants' motions for summary judgment are GRANTED. A separate Order follows.

8/9/2018
Date

/S/
Paula Xinis
United States District Judge